

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 18, 2017 at Knoxville

**RODNEY WATKINS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 09-07892     Lee V. Coffee, Judge**

_____

**No. W2016-00075-CCA-R3-PC**
_____

The petitioner, Rodney Watkins, appeals the denial of post-conviction relief from his 2009 Shelby County Criminal Court jury conviction of second degree murder, for which he received a sentence of 25 years. In this appeal, the petitioner contends only that he was denied the effective assistance of counsel. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Monica A. Timmerman (on appeal) and William B. Kelley (at hearing), Memphis, Tennessee, for the appellant, Rodney Watkins.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Shelby County Criminal Court jury convicted the petitioner of second degree murder, and the trial court imposed a 25-year sentence. This court affirmed the convictions on direct appeal. *See State v. Rodney Watkins*, No. W2010-02570-CCA-R3-CD (Tenn. Crim. App., Jackson, Feb. 13, 2013), *perm. app. denied* (Tenn. July 16, 2013).

In *Rodney Watkins*, this court stated the facts of the case. Lamika Turner, the victim, disappeared on February 3, 2009. *Id.*, slip op. at 1. According to the victim's mother, the victim "was supposed to have gone to the [petitioner]'s home." *Id.*, slip op. at 2. When a police investigator spoke with the petitioner on February 7, the petitioner stated that he had last seen the victim getting into a car with a man known as "'Keevin,'"

whom the petitioner later identified in a photographic lineup as Kevin Lee Harris. *Id.* On May 8, police officers discovered a badly decomposed body inside a bedroom of an abandoned house at 1517 Cella Street, which residence was located next door to the petitioner's house. *Id.*, slip op. at 3, 4, 6. Through the aid of dental x-rays, the body was positively identified as that of the victim. *Id.*, slip op. at 2.

Officers who processed the scene discovered pieces of a cinder block in the bedroom where the victim's body was located. *Id.*, slip op. at 3. One of the cinder block pieces "appeared to have blood and black hairs on it." *Id.*, slip op. at 4. The victim's body was found face-down underneath two mattresses; she was wearing only a shirt, and "[b]ased upon the way the victim's clothing was removed," officers believed it to be likely that she had been the victim of a sexual assault. *Id.*, slip op. at 4, 5. The medical examiner testified that the victim had sustained skull fractures and determined that the victim's cause of death was blunt force trauma to the head. *Id.*, slip op. at 16.

Mr. Harris testified and denied any involvement in the victim's death. *Id.*, slip op. at 10. According to Mr. Harris, "on the last night the victim was seen alive," she visited Mr. Harris' house at 1400 Cella Street with her sister. *Id.*, slip op. at 7. When the victim, her sister, and others left at sunrise the following morning, the victim asked fellow guest, Floyd Jackson, to "take her to the [petitioner]'s house." *Id.*

The petitioner was interviewed by Memphis police officers in early July 2009. *Id.*, slip op. at 18. In his first written statement, the petitioner denied any responsibility for the victim's death and claimed that he was not present when she died, blaming the murder on Mr. Harris and a man known as "Benzo." *Id.* The following day, however, the petitioner told officers that he "wanted to tell the truth":

> [T]he [petitioner] stated that he and the victim were at 1517 Cella Street about to have consensual sex when he heard a noise outside. The [petitioner] said the victim had been undressing and he had been applying a condom to himself. The [petitioner] said that he told the victim to dress and that he picked up a cinder block. The [petitioner] said Benzo came through the door aggressively. . . . [T]he [petitioner] claimed he raised the cinder block in the air and hit the victim, who was standing behind him, on top of the head and caused her to fall. . . . [T]he [petitioner] stated that Benzo continued coming toward him aggressively and that the [petitioner] fell on top of the victim, hitting the back of her head with the cinder block. . . . [T]he [petitioner] claimed he and Benzo struggled and that he was able to free himself and

- 2 -

flee the house, leaving the victim behind. . . . [T]he [petitioner] stated that he heard the victim screaming and that Benzo had a metal rod or stick he used to strike the victim.

*Id.*, slip op. at 21. Sergeant Anthony Mullins testified that "to his knowledge, no one except the [petitioner] gave an accurate description of the victim's clothing at the time of her disappearance." *Id.*, slip op. at 20.

On November 25, 2013, the petitioner filed, pro se, a timely petition for post-conviction relief, alleging, *inter alia*, that he was deprived of the effective assistance of counsel. Following the appointment of counsel and the amendment of the petition, the post-conviction court conducted an evidentiary hearing on October 30, 2015.

At the evidentiary hearing, trial counsel testified that he had practiced criminal law exclusively for 18 years and that, during the course of his representation of the petitioner, he and the petitioner communicated often. Trial counsel confirmed that the State had offered the petitioner a 15-year sentence, which the petitioner had declined because he wanted "a lesser sentence."

With respect to trial strategy, trial counsel stated that he and the petitioner had discussed two potential defenses: first, that the petitioner had accidentally struck the victim twice with the cinder block when Mr. Harris and Benzo entered the house, and second, that the victim had been killed by an unknown assailant. Trial counsel testified that he and the petitioner had "rejected" the first defense because a witness had seen the petitioner leaving the abandoned house on the night in question and because counsel believed there was no "rational way" to convince a jury that the petitioner had "accidentally" struck the victim twice. Trial counsel stated that he had even cautioned the petitioner that they "had no expert proof to show how he could strike a woman twice with a brick accidentally." Counsel believed that the second defense was stronger because one of the petitioner's friends, Gregory Drinkwater, testified that, while he and the petitioner had been watching the Super Bowl in February of 2009, he had seen the victim get into the vehicle of an unknown man, who theoretically killed her. Trial counsel believed that this defense would be further bolstered by the fact that the petitioner's original charge of first degree murder had been reduced to second degree murder following the petitioner's admission of involvement in the crime; counsel testified that the petitioner's explanation in that statement of accidentally hitting the victim seemed so "bizarre" that counsel thought he could "attack[] the validity of that statement." Trial counsel added that he had "had other cases and gotten acquittals in other cases where defendants [had] admit[ted] their involvement" but that he had been able to show the jury "how ridiculous their statement[s]" were.

On cross-examination, trial counsel agreed that both he and his investigator had met with the petitioner "many times" in preparation for trial. Trial counsel also acknowledged that he had discussed trial strategy with the petitioner and that "together" the two men had agreed that the defense involving Mr. Drinkwater's testimony was the "better course" to follow.

Ronald Burgess testified in the evidentiary hearing about his recollection of the events that occurred on the last night the victim was seen alive. Mr. Burgess recalled seeing the victim enter the abandoned house on Cella Street, followed by the petitioner. Approximately 30 minutes later, he saw two men whom he later identified as Mr. Harris and Benzo enter the house. Before the men entered the house, Mr. Burgess heard them "asking where she was and talking about they were going to kill her." A short time later, Mr. Burgess saw the petitioner "run out" of the house, followed 20 to 30 minutes later by Mr. Harris and Benzo. Mr. Burgess never saw the victim leave the house.

On cross-examination, Mr. Burgess conceded that the petitioner's girlfriend had contacted him following the petitioner's arrest and encouraged him to speak with the petitioner's investigator about what he had seen in February. Mr. Burgess also acknowledged that the investigator had given him the names of Mr. Harris and Benzo. Mr. Burgess agreed that he had never contacted the police about what he had seen on that February evening. Mr. Burgess was aware that the defense had considered calling him to testify at trial but that they had ultimately decided against it.

The petitioner testified that he was initially pleased with trial counsel's representation but that, as time went on, counsel stopped responding to the petitioner's letters and disagreed with the course of action which the petitioner wanted to pursue, chiefly calling Mr. Burgess as a witness at trial. The petitioner stated that he had told trial counsel that he wished to testify at trial but that trial counsel advised against it because of the petitioner's criminal history. On cross-examination, however, the petitioner acknowledged that he had told the trial court that he had voluntarily made the decision not to testify. The petitioner was also displeased that trial counsel chose not to file a motion to suppress his pretrial statement on the basis of an illegal arrest.

With this evidence, the post-conviction court denied relief, finding that trial counsel "made a strategic trial decision to challenge the State's case on the issue of identity and an involuntary statement." The court continued as follows:

> Ronald Burgess was produced at the evidentiary hearing. [Trial counsel] had located, interviewed, and had made a strategic trial decision not to call Burgess as a witness. His testimony was not helpful to the [p]etitioner and

was inculpatory. Mr. Burgess' testimony would have placed the [p]etitioner at the location of the killing and would have shown the [petitioner] running away from the scene of the killing. [Trial counsel] made a proper decision not to call Burgess as a witness. The [p]etitioner wholly failed to show how this inculpatory testimony would have made a difference in this case. The petitioner was unable to demonstrate how further preparations by his trial counsel might have been helpful. The petitioner has been unable to establish how the calling of any other witnesses in this trial would have made a difference in the results of the trial. Trial counsel made a well-founded strategic choice to challenge the identity of the [petitioner] in this case.

In addition, the court specifically found the petitioner's testimony was not credible and found that trial counsel "provided the petitioner with more tha[n] effective representation." The post-conviction court ultimately concluded that the petitioner had "wholly failed to demonstrate" that trial counsel was ineffective and had "failed to show by clear and convincing evidence either a deficiency or prejudice."

In this appeal, the petitioner reiterates his claim of ineffective assistance of counsel, claiming that trial counsel performed deficiently by failing to pursue the defense of an accidental killing and by failing to call Mr. Burgess to testify at trial. The State contends that the court did not err by denying relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the

services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record fully supports the ruling of the post-conviction court. Trial counsel testified – and the post-conviction court implicitly accredited his testimony – that he believed the pursuit of the accidental killing defense, which would have included the testimony of Mr. Burgess, to be inadvisable and because it seemed so implausible. Moreover, trial counsel had informed the petitioner that no expert testimony was available to explain how the petitioner could have, on two separate occasions, accidentally struck the victim in the head with a cinder block. Rather, trial counsel believed the better course of action was to pursue the defense that the victim had been killed by an unknown assailant and to cast doubt on the voluntariness of the petitioner's

eventual admission to officers of an accidental killing. We will not second-guess these reasonable trial strategies and tactical decisions. *See Adkins*, 911 S.W.2d at 347. Furthermore, given the substantial evidence against the petitioner, he cannot establish that, but for counsel's alleged errors, the outcome would have differed. *See Strickland*, 466 U.S. at 694. As such, we hold the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial.

The petitioner failed to establish that he was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE